**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Case No. 1:16-mc-00370-P1

AFRICARD CO. LTD.,

        Petitioner-Judgment Creditor,

        -against-

THE REPUBLIC OF NIGER,

        Respondent-Judgment Debtor.

## AFRICARD CO. LTD.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION BROUGHT BY AN ORDER TO SHOW CAUSE FOR ISSUANCE OF A RESTRAINING NOTICE AND A TEMPORARY RESTRAINING ORDER

CHADBOURNE & PARKE LLP
*Attorneys for Petitioner-Judgment Creditor*
*Africard Co. Ltd.*
1301 Avenue of the Americas
New York, N.Y., 10019-6022
(212) 408-5100 (telephone)
(212) 541-5369 (facsimile)

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................................1

II.   FACTUAL BACKGROUND & PROCEDURAL HISTORY ...........................................3

    A.    The Agreement.........................................................................................................3

    B.    The Final Award .....................................................................................................4

    C.    The D.C. Judgment .................................................................................................4

    D.    The Nigerien Assets ...............................................................................................5

III.  ARGUMENT ......................................................................................................................6

    1.    Africard Is Entitled To A Temporary Restraining Order.......................................6

    A.    The Court Has Subject Matter Jurisdiction............................................................6

    B.    The Court Can Exercise Personal Jurisdiction Over All Parties and Venue is Proper......................................................................................................................6

    C.    The Nigerien Assets Are Not Immune From Restraint Or Attachment.................7

    D.    Africard Has Served Niger With The Default Judgment As Required By 28 U.S.C. § 1610(e) ...................................................................................................9

    E.    Africard May Restrain Niger And SOPAMIN's Commercial Assets In Accordance With 28 U.S.C. § 1610(d) ..................................................................9

    1.    Africard Is Entitled To A Restraining Order .......................................................10

    A.    Africard Is Likely To Succeed On The Merits Of Its Motion To Serve A Restraining Order..................................................................................................11

        1.    N.Y.C.P.L.R. § 5222(b) Permits The Restraint Of The Assets, And May Be Used To Restrain The Assets Of A Sovereign...........................11

        2.    The Nigerien Assets Can Be Restrained Because They Are Used For Commercial Activity In The United States, SOPAMIN Is An Instrumentality Of Niger, And SOPAMIN Is Extensively Controlled By Niger............................................................................................................12

        3.    Niger Uses SOPAMIN's Property as Its Own, Ignores The Separate Legal Status Of Niger, And Directly Involves Itself In SOPAMIN Decisions.......................................................................................................19

        4.    Niger Exerts Economic Control Over SOPAMIN and SOPAMIN's Profits Go To Niger, Who Is The True Beneficiary Of SOPAMIN's Actions ....................................................................................................22

    B.    Africard Will Suffer Irreparable Harm if the Nigerien Assets are Not Restrained ...........................................................................................................23

    C.    The Balance of Equities Favors Issuing the Restraining Order...........................24

    D.    Granting the Restraining Order Promotes the Public Interest ..............................24

    E.    Security .................................................................................................................25

IV.   CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Africard Co. v. Republic of Niger,*
  2016 WL 5396666 (D.D.C. Sept. 27, 2016) .................................................................2, 5

*Arch Trading Corp. v. Republic of Ecuador,*
  2016 WL 5956686 (2d Cir. Oct. 14, 2016) .......................................................................15

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,*
  598 F.3d 30 (2d Cir. 2010) ...............................................................................................10

*Citigroup Inc. v. City Holding Co.,*
  97 F. Supp. 2d 549 (S.D.N.Y. 2000) ..................................................................................7

*Daimler AG v. Bauman,*
  134 S. Ct. 746, 187 L. Ed. 2d 624 (2014) ..........................................................................7

*EM Ltd. v. Banco Cent. De La Republica Argentina,*
  800 F.3d 78 (2d Cir. 2015) ...............................................................................................14

*Energy Capital Co. v. Caribbean Trading and Fidelity Corp.,*
  1994 U.S. Dist. Lexis 15494 (S.D.N.Y. Oct. 28, 1994) ...................................................24

*In re Feit & Drexler, Inc.,*
  760 F.2d 406 (2d Cir. 1985) .............................................................................................23

*Fireman's Ins. Co. v. Keating*
  753 F. Supp. 1146 (S.D.N.Y 1990) ...................................................................................24

*First Nat'l City Bank v. Banco Parra el Comercio Exterior de Cuba,*
  462 U.S. 611, 103 S. Ct. 2591 (1983) ..............................................................................13

*Funnekotter v. Agric. Dev. Bank of Zimbabwe,*
  2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015) ..................................................................14

*Hasset v. Goetzmann,*
  1992 U.S. Dist. LEXIS 13218 (N.D.N.Y. Sept. 1, 1992) ..................................................5

*Hester Int'l Corp. v. Fed. Republic of Nigeria,*
  879 F.2d 170 (5th Cir. 1989) ............................................................................................14

*HSH Nordbank AG N.Y. Branch v. Swerdlow,*
  2010 WL 1957265 (S.D.N.Y. May 14, 2010) ....................................................................5

*Johnson v. Chem. Bank,*
1996 WL 706893 (S.D.N.Y. Dec. 9, 1996) ..........................................................................11

*Kensington Int'l Ltd. v. Republic of Congo,*
2007 WL 1032269 (S.D.N.Y. Mar. 30, 2007) ......................................................................22

*Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.,*
841 F. Supp. 2d 769 (S.D.N.Y. 2012)..................................................................................8

*McKesson Corp. v. Islamic Republic of Iran,*
52 F.3d 346 (D.C. Cir. 1995) ......................................................................................14, 15

*Mitchell v. Lyons Prof'l Servs., Inc.,*
727 F. Supp. 2d 120 (E.D.N.Y. 2010) ................................................................................11

*N. Mariana Islands v. Millard,*
845 F. Supp. 2d 579 (S.D.N.Y. 2012)..................................................................................11

*NML Capital Ltd. v. Republic of Argentina,*
699 F.3d 246 (2d Cir. 2012)................................................................................................23

*Palestine Monetary Auth. v. Strauchman,*
62 A.D.3d 213 (1st Dept. 2009)..........................................................................................12

*RCA Corp. v. Tucker,*
696 F. Supp. 845 (E.D.N.Y. 1988) ......................................................................................6

*Smith v. Fed. Reserve Bank of N.Y.,*
280 F. Supp. 2d 314 (S.D.N.Y. 2003), *aff'd,* 75 F. App'x 860 (2d Cir. 2003)....................23

*Estate of Smith v. Fed. Reserve Bank of N.Y.,*
346 F.3d 264 (2d Cir. 2003)................................................................................................23

*Sumitomo Shoji N.Y. Inc. v. Chem. Bank N.Y. Trust Co.,*
263 N.Y.S.2d 354 (Sup. Ct., Spec. Term, 1965) ................................................................12

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
60 F.3d 27 (2d Cir. 1995)....................................................................................................24

*U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,*
1999 WL 307666 (S.D.N.Y. May 17, 1999), *aff'd,* 199 F.3d 94 (2d Cir. 1999).........15, 19, 21

*Vinos Argentinos Imps. USA, Inc. v. Los Andes Importes, Inc.,*
1993 WL 465353 (S.D.N.Y. Nov. 8, 1993).........................................................................11

*Von Grabe v. Ziff Davis Publ'g Co.,*
1994 WL 719697 (S.D.N.Y. Dec. 29, 1994) ......................................................................11

*Weltover, Inc. v. Republic of Argentina,*
    941 F.2d 145 (2d Cir.1991)............................................................................8

**Statutes**

28 U.S.C. § 1330................................................................................6, 7

28 U.S.C. § 1391..................................................................................7

28 U.S.C. § 1603..................................................................................8

28 U.S.C. § 1608..............................................................................9, 10

28 U.S.C. § 1610..........................................................6, 7, 8, 9, 10, 12, 14

28 U.S.C. § 1963..................................................................................5

**Other Authorities**

Fed. R. Civ. P. 4..................................................................................7

Fed. R. Civ. P. 55(b).............................................................................5

Fed. R. Civ. P. 65.......................................................................1, 10, 25

Fed. R. Civ. P. 69........................................................................1, 6, 11

N.Y.C.P.L.R § 301................................................................................7

N.Y.C.P.L.R.§ 5222....................................................................8, 11, 12

Petitioner/Judgment Creditor, Africard Co. Ltd. ("Africard"), submits this Memorandum of Law in support of its motion brought by an order to show cause, pursuant to 28 U.S.C. § 1610(c), Rule 69 of the Federal Rules of Civil Procedure, and Section 5222(b) of the New York Civil Practice Law and Rules ("N.Y.C.P.L.R"), for the issuance of a restraining notice against a bank account under the control of the Republic of Niger ("Niger"), held in the name of its instrumentality and agent and/or alter ego, the Société de Patrimoine des Mines du Niger ("SOPAMIN"), maintained by Citibank N.A., its parent corporation Citigroup, Inc., or any affiliate of either of these entities ("Citibank"), in the State of New York and the Southern District of New York. Accordingly, Africard respectfully requests that the Court issue an order allowing Africard to serve a restraining notice on Citibank.

Africard also moves, pursuant to Federal Rule of Civil Procedure 65, for a temporary restraining order ("TRO") (1) immediately restraining (a) Citibank, (b) Judgment Debtor Niger, (c) SOPAMIN, an instrumentality and agency and/or alter ego of Niger, and (d) any other person or entity with notice of the order from making or permitting the transfer of funds or any other assets deposited, or controlled, or for the benefit of, SOPAMIN and/or Niger, in the possession of Citibank, until Africard's motion for an order allowing the issuance of a restraining notice is adjudicated by the Court, and (2) directing Niger to appear to show cause why a restraining notice should not be issued.

## I.     PRELIMINARY STATEMENT

Niger owes Africard $42,442,970.46, plus post judgment interest, based on an unsatisfied judgment rendered by the United States District Court for the District of Columbia on September 27, 2016 (the "D.C. Judgment"), which confirmed an arbitration award issued on December 6,

2014 (the "Arbitration Award").[1] *Africard Co. v. Republic of Niger*, No. CV 16-00196 (ABJ), 2016 WL 5396666, at *1 (D.D.C. Sept. 27, 2016); Beckett Decl., Ex. G. Niger failed to appear or otherwise participate in the District of Columbia confirmation proceedings.

Africard has reason to believe that SOPAMIN, an instrumentality and alter ego and/or agent of Niger, which engaged in commercial activity in the United States, maintains a bank account(s) under the control of Citibank, in New York City (collectively, the "Nigerien Assets"). Beckett Decl., ¶ 6.

Africard now seeks permission to restrain the Nigerien Assets held by Citibank, ultimately in order to satisfy (in part or in full) the D.C. Judgment against Niger. Africard also seeks a TRO forbidding Citigroup, SOPAMIN, Niger, or any other person or entity with notice of the TRO, from making or suffering any sale, assignment or transfer of, or interference with, the Nigerien Assets until Africard's motion for a restraining order is adjudicated by the Court.

A TRO and restraining order are appropriate to restrain the Nigerien Assets as a conservatory measure. As shown below, the Nigerien Assets are used for commercial activity in the United States, Niger has waived its sovereign immunity, and Niger extensively controls SOPAMIN, to such an extent that SOPAMIN is an alter ego and/or agent of Niger.

Indeed, SOPAMIN is completely subservient, and subject to the control, of Niger, as shown below because *inter-alia*: (1) Niger controls the SOPAMIN board and the vast majority of the board members are appointed directly by the President, Prime Minister, and government Ministers; (2) the express purpose of SOPAMIN is to "manage the holdings of the Republic of Niger" and to "carry out, on behalf of the Republic of Niger, any mining or quarry operation;"

---

[1] The D.C. Judgment awarded Africard $46,128,410.46. Earlier this year, Africard and Niger entered into a partial satisfaction of the Final Award in the amount of $3,685,440. Africard registered this partial satisfaction of judgment with the Court. D.E. 6. Accordingly, Niger still owes Africard $42,442,970.46 plus post judgment interest.

(3) the Director General of SOPAMIN (akin to a Chief Executive Officer) is appointed by the President's Cabinet of Ministers; (4) the Minister of Mines and Minister of Finance oversee SOPAMIN; (5) the Director General of SOPAMIN reports directly, with regularity, to the President of Niger; (6) government Ministers, with no position in SOPAMIN, appear to have signatory power to remove millions of dollars of funds from SOPAMIN accounts; (7) Niger negotiates critical agreements on behalf of SOPAMIN, without SOPAMIN's participation, and then requires SOPAMIN to abide by such agreements; (8) SOPAMIN describes itself as a government agency and has government regulatory powers; and (9) Niger has the power to compel SOPAMIN to advance dividends in order to strengthen the national budget.

Moreover, the Court should restrain the assets because Niger and/or SOPAMIN may easily move the assets outside of the jurisdiction of this Court. In light of this, Africard has not provided notice to Niger, SOPAMIN, or Citibank of this application for a TRO because of the significant threat of immediate and irreparable harm that could arise from the provision of such a notice, as well as the non-issuance of a TRO. Specifically, if Africard were to provide Citibank, Niger and/or SOPAMIN with notice, it would also provide SOPAMIN and Niger with a significant window of time during which they could, in light of a pending application for a TRO, remove the Nigerien Assets from the jurisdiction of this court, rendering fruitless any further prosecution of this judgment.

## II.     FACTUAL BACKGROUND & PROCEDURAL HISTORY

### A.     The Agreement

In and around 2011, Niger sought to obtain a contractor to mass produce biometric and electronic passports. On October 13, 2011 Africard and Niger entered into a production agreement (the "Agreement"). Beckett Decl., ¶ 8. The Agreement contains an arbitration clause which provides that, failing an amicable settlement, disputes shall be submitted for arbitration

under the auspices of the Common Court of Justice and Arbitration ("CCJA") of l'Organisation pour l'Harmonisation en Afrique du Droit des Affaires ("OHADA) in Abidjan, Côte d'Ivoire.[2] *Id.* at ¶ 9. On March 24, 2013, Niger unilaterally terminated the Agreement. *Id.* at ¶ 9. On April 8, 2013, after efforts to amicably resolve the dispute failed, Africard submitted the dispute to arbitration under the arbitral rules of, and administered by, the OHADA CCJA in Abidjan, Côte d'Ivoire, as provided for in the Agreement. *Id.*

### B. The Final Award

The CCJA found Niger liable to Africard, declaring that "the unilateral termination [of the Agreement] by the Republic of Niger is abusive and wrongful." Beckett Decl., Ex. F ¶ 107. On December 6, 2014, the tribunal issued a Final Award, awarding Africard compensation for Niger's wrongful termination of the Agreement. *See* Beckett Decl., Ex. H ¶ 64.

### C. The D.C. Judgment

On February 4, 2016, Africard filed a petition to confirm the Final Award in the United States District Court for the District of Columbia. On February 12, 2016, Niger was served by the Clerk of the Court in accordance with these FSIA service requirements. Beckett Decl., ¶ 12. As the United District Court for the District of Columbia noted "Niger has not taken any steps to defend this action." *Africard Co.*, No. CV 16-00196 (ABJ), 2016 WL 5396666, at *5. Africard moved for default judgment on May 13, 2016, pursuant to Federal Rule of Civil Procedure 55(b). *Id.* at *2. On September 27, 2016, the court issued a judgment stating that "it will award judgment to Africard in the amount of $46,128,410,46." *Id.* at *15. On October 5, 2016, Niger was served with a copy and French translation of the D.C. Judgment. Beckett Decl.,

---

[2] OHADA is a treaty establishing a multi-lateral system of laws, regulations, and implementing institutions applicable to a number of west and central African nations, including Niger. The CCJA is one of the implementing institutions created by the OHADA Treaty.

Ex. J. On October 18, 2016, Africard registered the D.C. Judgment in the United States District Court of the Southern District of New York. D.E. 2.[3]

Africard and Niger entered into a partial settlement (the "Partial Settlement") on July 30, 2016, in which Niger explicitly waived its sovereign immunity including from "attachment[] prior to the entry of judgment" and post-judgment attachment. D.E. 6.[4]

## D. The Nigerien Assets

The principal export of Niger is uranium. Beckett Decl., Ex. II. The Republic of Niger exports its uranium through the state owned company, SOPAMIN. Beckett Decl., Ex. K, Ex. M. The principal purchaser of Nigerien uranium in the United States is Exelon Generation Company, LLC—a subsidiary of Exelon Corporation ("Exelon"). Beckett Decl., Ex. FF. Since 2007, Niger, through SOPAMIN, has sold hundreds of millions worth of uranium concentrates to Exelon, pursuant to a contract in which SOPAMIN is described as "an agency of the government of the Republic of Niger." Beckett Decl., Ex. K at 3.[5] This contract will expire, if it has not already, in 2016. *Id.*

Upon information and belief, SOPAMIN has a bank account(s) at Citibank (the Nigerien Assets) in which it deposits proceeds from its transactions with Exelon. Africard now seeks an order restraining the funds in that bank account to satisfy (in part or in whole) the Judgment

---

[3] When a judgment is registered in a federal district court other than the court in which it was rendered, it has "the same effect as a judgment of the district court of the district where registered and may be enforced in like manner." 28 U.S.C. § 1963. For enforcement purposes, the D.C. Judgment is the same as a judgment rendered by this Court. *See HSH Nordbank AG N.Y. Branch v. Swerdlow,* No. 08 CIV. 6131 (DLC), 2010 WL 1957265, at *1 (S.D.N.Y. May 14, 2010); *Hasset v. Goetzmann,* 1992 U.S. Dist. LEXIS 13218, at *8 (N.D.N.Y. Sept. 1, 1992).

[4] Africard has filed the Partial Settlement and a certified English translation with the Court so that it may be applied against any proceeds that may ultimately be obtained through turnover proceedings and in order to record Niger's waiver of immunity.

[5] More detail on SOPAMIN's role as an alter ego and/or agent of Niger is found *infra* in Section III (1).

against Niger. Accordingly, Africard seeks a TRO, for conservatory purposes, to restrain any person or entity with notice of the order, including but not limited to Citibank, SOPAMIN, and Niger, from permitting the transfer of any funds from the Nigerien Assets until the court adjudicates Africard's motion for permission to serve a restraining notice until the Court adjudicates any execution procedures initiated by Africard in connection with the Nigerien Assets.

## III. ARGUMENT

### 1. Africard Is Entitled To A Temporary Restraining Order

#### A. The Court Has Subject Matter Jurisdiction

This Court has subject matter jurisdiction in this proceeding pursuant to 28 U.S.C. § 1330(a), which provides the federal courts with original jurisdiction with respect to "any claim for relief *in personam* with respect to which the foreign state is not entitled to immunity." 28 U.S.C. § 1330(a); *see also RCA Corp. v. Tucker*, 696 F. Supp. 845, 850 (E.D.N.Y. 1988) ("[a]s to subject matter jurisdiction, the authorities are unanimous that a federal court maintains ancillary jurisdiction to enforce its own judgments, and that, under Rule 69, Fed. R. Civ. P., no independent jurisdictional basis is necessary to commence an enforcement proceeding against a garnishee not a party to the original suit."). As shown below, Niger is not entitled to sovereign immunity. 28 U.S.C. § 1610, *et seq.* (providing exceptions to immunity from execution).

#### B. The Court Can Exercise Personal Jurisdiction Over All Parties and Venue is Proper

This Court has general personal jurisdiction over Citigroup, Inc. and Citibank, N.A., residents of New York, pursuant to New York law as incorporated here via Federal Rule of Civil Procedure 4. N.Y.C.P.L.R § 301. Citigroup, Inc. is headquartered in New York City, which is the corporation's principal place of business. *See Citigroup Inc. v. City Holding Co.*, 97 F. Supp.

2d 549, 553 (S.D.N.Y. 2000) (finding Citigroup's principal office is in New York, New York). Thus, Citigroup, Inc. and its consumer division Citibank, N.A., may be considered "at home" in New York and thus subject to general personal jurisdiction in its courts, including the Southern District of New York. *See Daimler AG v. Bauman,* 134 S. Ct. 746, 754, 187 L. Ed. 2d 624 (2014).[6] Moreover, although not necessary at this stage, the Court has personal jurisdiction over Judgment Debtor Niger and SOPAMIN pursuant to 28 U.S.C. § 1330(b).

The Southern District of New York is the proper venue for this proceeding pursuant to 28 U.S.C. § 1391(b), (d), and (f)(1), because, *inter alia*, the property that is the subject of this action—the Nigerien Assets—is situated in this jurisdiction.

## C.  The Nigerien Assets Are Not Immune From Restraint Or Attachment

Because they are used in commercial activity, are subject to being used to satisfy a judgment based on an international arbitration award, and because Niger has expressly waived sovereign immunity, the Nigerien Assets are not immune from restraint or attachment. The FSIA exempts from attachment immunity (and eventual execution) those assets "used for a commercial activity in the United States" where "the foreign state has waived its immunity from attachment in aid of execution or from execution," or "the judgment is based on an order confirming an arbitral award rendered against the foreign state." 28 U.S.C. § 1610(a)(1) & (6).

In interpreting the "commercial activity" exception of the FSIA, courts look to the "nature" of the act rather than its "purpose." 28 U.S.C. § 1603 ("The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."); *see also Weltover, Inc. v. Republic of*

---

[6] In addition, because the funds at issue are located in the jurisdiction of the Court, the Court has *in rem* jurisdiction over the Nigerien funds held by Citigroup, Inc. and Citibank N.A.

*Argentina*, 941 F.2d 145, 150 (2d Cir.1991); *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769, 785-786 (S.D.N.Y. 2012).

The entire purpose of SOPAMIN is to earn revenue for Niger through the sale of the state's natural resources, in particular, uranium. It is public record that SOPAMIN is engaged in the sale of uranium and the only known customer of SOPAMIN's uranium in the United States is Exelon. Beckett Decl., Exs. M, FF. It follows that the Citibank accounts in question are used in connection with commercial activity as defined in FSIA 28 U.S.C. § 1610(a).[7]

Moreover, the judgment is "based on an order confirming an arbitral award" in favor of Africard against Niger. 28 U.S.C. § 1610(a)(6); Beckett Decl., ¶ 9. Thus, the Nigerien Assets do not enjoy sovereign immunity under 28 U.S.C. § 1610(a)(6) because of the nature of the D.C. Judgment (*i.e.*, that it was based on an order confirming an arbitral award), in addition to the fact that the assets do not enjoy immunity because of their commercial nature.

Additionally, Niger has expressly and unambiguously waived any defense of sovereign immunity. As part of the Partial Settlement, Niger explicitly waived sovereign immunity as a defense in regards to enforcement or seizure proceedings, including "a right of immunity from execution or exemption from seizure in the context of legal proceedings (which may include…attachments prior to the entry of judgment or attachment in support of a judgment or all other attachments, pending or forthcoming…)" D.E. 6, Ex. 1 at Art. 3. This is an effective waiver of the type expressly envisioned in 28 U.S.C. § 1610(a)(1).

---

[7] Even if, for purposes of argument, the Citibank accounts are unrelated to SOPAMIN's long-standing commercial relationship with Exelon, in light of SOPAMIN's central function, the presumption must be that the assets are related to a commercial activity: the sale of Nigerien uranium or some other Nigerien mineral asset. In conjunction with the efforts to restrain the assets, Africard is seeking additional information about this account, including the timing and amounts of credits and debits to the account, and the source of incoming transfers and deposits.

**D. Africard Has Served Niger With The Default Judgment As Required By 28 U.S.C. § 1608(e)**

Under the FSIA, Africard is required to serve Niger with a copy of the default judgment before proceeding to attach or execute on any Nigerien assets. Pursuant to 1610(c), "no attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and giving of any notice required under section 1608(e) of this chapter." 28 U.S.C. § 1610(c). As discussed above, Africard served Niger with the default judgment pursuant to 28 U.S.C. § 1608(e) by sending a "copy of any such default judgment…to the foreign state or political subdivision in the manner prescribed for service in this section." As there is no "special arrangement for service" and no "applicable international convention on service of judicial documents" as contemplated in 28 USC §§ 1608(a)(1) and 1608(a)(2), Africard served Niger with the DC Judgment pursuant to Section 1608(a)(3) via international courier, with a certified French-language translation, and a receipt of delivery. On October 5, 2016, the judgment and translation were received by the head of the ministry of foreign affairs of Niger. Beckett Decl., Ex. J. Accordingly, Africard has fully satisfied the requirements of 28 U.S.C. § 1608(e).

**E. Africard May Restrain Niger And SOPAMIN's Commercial Assets In Accordance With 28 U.S.C. § 1610(d)**

Africard respectfully submits that the requirement in Section 1610(c) of the FSIA that "a reasonable time" must elapse from the entry of judgment and the giving of notice before an attachment or execution can be made does not apply here because a restraining order pursuant to N.Y.C.P.L.R. 5222 is neither an attachment nor an execution. 28 U.S.C. § 1610(c). Nevertheless, out of an abundance of caution, Africard seeks permission from the Court for a temporary restraining order and restraining notice, as if 28 U.S.C. § 1610(c) were applicable.

9

Here, even assuming that §1610(c)'s "reasonable time" requirement applies, Niger has expressly waived immunity from attachment or restraint. In the Partial Settlement, Niger waived any "right of immunity from execution or exemption from seizure in the context of legal proceedings (which may include...attachments prior to the entry of judgment or attachment in support of a judgment or all other attachments, pending or forthcoming...) ..." D.E. 6, Ex. 1 at Art. 3. This broad waiver extends to the restraining order pursuant to N.Y.C.P.L.R.§5222(b) that Africard seeks, and, for that matter, to any temporary restraining order the objective of which is to preserve the judgment-debtor's assets and prevent them from dissipation or transfer.

The FSIA specifically contemplates waivers of sovereign immunity. Pursuant to §1610(d), "[t]he property of a foreign state . . . shall not be immune from attachment prior to the entry of judgment . . . or prior to the elapse of the period of time provided in subsection (c) of this section, if—(1) the foreign state has explicitly waived its immunity from attachment prior to judgment . . . and (2) the purpose of the attachment is to secure satisfaction of a judgment . . . 28 U.S.C. § 1610(d). Here, both conditions are satisfied. Niger has provided a express and wide ranging waiver of immunity from attachment or execution of any kind. In addition, the purpose of the restraint of the Nigerien Assets is to secure satisfaction of the D.C. Judgment. Thus, Niger cannot rely upon the "reasonable time" provision of Section 1608(c) of the FSIA, to prevent the issuance of a restraining order. *See* 28 U.S.C. § 1610(c)

### 1. Africard Is Entitled To A Restraining Order

Africard seeks a TRO pursuant to Federal Rule of Civil Procedure 65(b). In determining whether to grant a TRO, courts weigh four factors: (1) the likelihood of the movant's success on the merits or sufficiently serious questions going to the merits; (2) the risk of irreparable harm absent equitable relief; (3) the balance of equities; and (4) the public interest. *See Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir.

10

2010); *see also Von Grabe v. Ziff Davis Publ'g Co.*, No. 91 Civ. 6275 (DLC), 1994 WL 719697, at \*1-2 (S.D.N.Y. Dec. 29, 1994) (same standard for TROs and preliminary injunctions). In this case, all four factors weigh heavily in favor of granting preliminary relief.

### A. Africard Is Likely To Succeed On The Merits Of Its Motion To Serve A Restraining Order

#### 1. N.Y.C.P.L.R. § 5222(b) Permits The Restraint Of The Assets, And May Be Used To Restrain The Assets Of A Sovereign

Pursuant to Federal Rule of Civil Procedure 69, the procedure for seeking a restraining order or attachment pursuant to a money judgment is that of the state in which the court rendering the judgment is found. *Vinos Argentinos Imps. USA, Inc. v. Los Andes Importes, Inc.*, No 91 Civ. 2587 (JSM), 1993 WL 465353, at \*1 (S.D.N.Y. Nov. 8, 1993). N.Y.C.P.L.R. Section 5222(b) allows for post-judgment restraining mechanisms, including the restraining notice that Africard herein requests in the form of a court order. Normally, if this did not involve a foreign sovereign, counsel for Africard would be authorized, under N.Y.C.P.L.R. § 5222, to unilaterally serve restraining notices on accounts held by Niger and SOPAMIN. Once served, those garnishees would have "no discretion in deciding whether to honor the notice." *See, e.g., Johnson v. Chem. Bank*, No. 96 CIV. 4262 (SS), 1996 WL 706893, at \*4 (S.D.N.Y. Dec. 9, 1996). However, out of an abundance of caution, Africard seeks that this restraining notice be issued by court order.

New York courts routinely uphold the restraint of funds on a *prima facie* showing that the corporate veil between the third party and the judgment debtor ought to be pierced. *See, e.g., N. Mariana Islands v. Millard*, 845 F. Supp. 2d 579 (S.D.N.Y. 2012) (finding that a judgment creditor need only *plausibly allege* that it can meet its burden that judgment debtor has an interest in the account); *see also Mitchell v. Lyons Prof'l Servs., Inc.*, 727 F. Supp. 2d 120, 123

(E.D.N.Y. 2010) ("It is equally well settled that this statute may be used to pierce the corporate veil or assert alter ego liability.").

Indeed, a plain reading of the text of the statute supports a broad construction of restraining notices. N.Y.C.P.L.R. § 5222(b) provides, in relevant part, that "a restraining notice served upon a person other than the judgment debtor is effective...if...he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor... *has an interest.*" N.Y.C.P.L.R. § 5222(b) (emphasis added). Moreover, the notice itself may properly include the name of "alter ego" entities. *See Sumitomo Shoji N.Y. Inc. v. Chem. Bank N.Y. Trust Co.*, 263 N.Y.S.2d 354, 356 (Sup. Ct., Spec. Term, 1965) (restraining notice served on bank specified account not in judgment debtor's name); *Palestine Monetary Auth. v. Strauchman*, 62 A.D.3d 213, 217 (1st Dept. 2009) (restraining notices included names of entities other than the judgment debtor).

Restraints issued against alter egos and/or agents of foreign sovereigns have also been upheld in the foreign sovereign immunities context. Courts have held that funds belonging to an instrumentality that is an alter-ego and/or an agent (like SOPAMIN) of a judgment debtor may be restrained to the same extent as funds belonging directly to the judgment debtor. *See Palestine Monetary Auth.*, 62 A.D.3d at 231 (reversing an order to modify restraining order to delete restraint against Palestine Monetary Authority because it had not shown separate juridical status from judgment debtor Palestinian Authority).

> **2.   The Nigerien Assets Can Be Restrained Because They Are Used For Commercial Activity In The United States, SOPAMIN Is An Instrumentality Of Niger, And SOPAMIN Is Extensively Controlled By Niger**

A judgment creditor may attach assets of a sovereign that are "used for commercial activity in the United States." 28 U.S.C. § 1610(a). This not only includes the assets of the

sovereign but also the assets of the foreign sovereign's state instrumentalities where the instrumentality is "so extensively controlled by its owner that a relationship of principal and agent is created" or where a finding of separateness between the sovereign and instrumentality "would work fraud or injustice." *See First Nat'l City Bank v. Banco Parra el Comercio Exterior de Cuba*, 462 U.S. 611, 629, 103 S. Ct. 2591, 2601 (1983). If neither exception applies, the assets are considered separate and non-attachable in what is known as the "*Bancec* presumption".

SOPAMIN is indisputably an instrumentality of the state. In *Export-Import Bank of the Republic of China v. Niger*, SOPAMIN stated that "it is a matter of public knowledge to which the Court may take judicial notice that SOPAMIN is an instrumentality of the government of Niger." Memorandum of Law in Support of Vacating a Temporary Restraining Order and in Support of a Protective Order Restraining Execution Efforts, *Export-Import Bank of China v. Republic of Niger*, No. 1:97-cv-03090-LAK-SN (S.D.N.Y. Feb. 10, 2015). Furthermore, as discussed, above in *infra* Section III(A)(1), the Nigerien assets are clearly used for commercial purposes.

In determining whether the state exerts "extensive control" over an instrumentality, the courts have used a number of factors to guide their analysis, including the degree to which: (1) the state exercises economic control over the instrumentality; (2) the instrumentality's profits go to the government, which is the true beneficiary of its actions; (3) the state uses the instrumentality's property as its own; (4) the instrumentality must obtain approvals for ordinary business decisions from a political actor; (5) state officials ignore the instrumentality's separate status or ordinary corporate formalities; and (6) the state issues policies or directives that cause the instrumentality to act directly on behalf of the state. *EM Ltd. v. Banco Cent. De La Republica Argentina*, 800 F.3d 800 F.3d 78, 91 (2d Cir. 2015); *McKesson Corp. v. Islamic*

13

*Republic of Iran,* 52 F.3d 346, 352 (D.C. Cir. 1995); *Hester Int'l Corp. v. Fed. Republic of Nigeria,* 879 F.2d 170, 178 (5th Cir. 1989); *see also* 28 U.S.C. § 1610(g) (listing similar factors in provision abrogating asset immunity of terrorist states' instrumentalities). Specifically, courts will analyze the foreign sovereign's level of control over the instrumentality's stock ownership, the instrumentality's board of directors, and whether the instrumentality defines its corporate interest as advancing the interests of the sovereign.

For example, in *Funnekotter v. Agric. Dev. Bank of Zimbabwe,* the United States District Court for the Southern District of New York found that the Zimbabwe Mining Development Corporation ("ZMDC"), an instrumentality of Zimbabwe, was an agent/alter ego of Zimbabwe where: (1) the state owned more than 51% of the ZMDC's stock; (2) appointed a majority of the ZMDC board members; (3) a Zimbabwean minister and the President of Zimbabwe directed ZMDC corporate decisions; and (4) the government of Zimbabwe directed when the ZMDC would make dividend payments, in order to assist Zimbabwe with its financial obligations. No. 13 CIV.1917 (CM), 2015 WL 9302560, at *5-*6 (S.D.N.Y. Dec. 17, 2015).

In a similar case, in *McKesson Corp. v. Islamic Republic of Iran,* the United States Court of Appeals for the District of Columbia Circuit determined that "there was more than enough evidence…that Iran had sufficient control over [an instrumentality] to create a principal/agent relationship" where (1) Iran owned 52% of the stock of a company; (2) Iran appointed "six of seven seats on its board of directors;" (3) Iran exercised control over the board such that the instrumentality took into account "the profit of the people and the Government" as a corporate interest; (4) the company considered that its "main objective…[was] to protect the interest of the country;" and (5) Iran was extensively involved in day-to-day operations. 52 F.3d at 351; *see also U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,* No. 97 CIV. 6124 (JGK), 1999 WL

307666, at *7 (S.D.N.Y. May 17, 1999), *aff'd*, 199 F.3d 94 (2d Cir. 1999) (finding the *Bancec* presumption overcome in part due to fact the entity was state owned, the entity was created by law to act directly or indirectly in furtherance of a state monopoly, and the entity's officers were state officials) (recently quoted with approval by the United States Court of Appeals for the Second Circuit in *Arch Trading Corp. v. Republic of Ecuador*, No. 15-2065(L), 2016 WL 5956686, at *8 (2d Cir. Oct. 14, 2016)).

Pursuant to SOPAMIN's implementing legislation, Ordinance 2007-003 (the "Ordinance"), the state vested SOPAMIN with the broad mission of controlling and realizing income from Niger's mining resources for the state. The Ordinance states that SOPAMIN's purpose is to "manage the holdings of the Republic of Niger" and to "carry out, on behalf of the Republic of Niger, any mining or quarry operation." Beckett Decl., Ex. Q, Art. 2. The Ordinance also provides that SOPAMIN may execute "all missions of general interest that may be entrusted to it by the State," within its "general purpose." *Id.* Thus, SOPAMIN's mission is to act directly in furtherance of Niger's interest.

Niger also controls all of SOPAMIN's shareholding. It owns almost all of SOPAMIN's shares – 98 percent – outright. Beckett Decl., Ex. M, at 1; Ex. HH, Art. 7. Niger controls even the remaining two percent through other entities which it directly owns and controls.[8] *Id.* Niger also directly controls the entire SOPAMIN board. State officials have the duty to directly appoint, at their discretion, nine out of SOPAMIN's 11 directors. Beckett Decl., Ex. HH, Art. 14. SOPAMIN's implementing legislation further establishes that "[t]he [SOPAMIN] directors representing the state are designated by decision of the Minister in charge of the sector." *Id.* Specifically, the board is appointed directly by the following public officials: (1) The Cabinet of

---

[8] CMEN is directly 38.45% owned by Niger, and 32.65% owned by SOPAMIN, and SONICHAR is 69.3% owned by Niger. Beckett Decl. ¶¶ 22-23.

the President of the Republic appoints two board members; (2) The Cabinet of the Prime Minister appoints one board member; (3) The Ministry of Mines appoints three board members; (4) The Ministry of Finance appoints one board member; (5) The Ministry of Commerce appoints one board member; and (6) The Ministry of Foreign Affairs appoints one board member. *Id.; see also* Beckett Decl., Ex. M, at 3. Moreover, the role of the directors is not to advance the role of the company but instead to "represent the state." Beckett Decl., Ex. M, at 3. The result is a board designed to be directly subservient to the state.

Consistent with this, the minutes of a SOPAMIN board meeting refer to directors in their representative capacities – such as "representing the President of the Republic" or "representing the Office of Prime Minister" or "representing the Ministry of Mines" – rather than as independent directors. Beckett Decl., Ex. U, at 1. This reflects the fact that the directors are not independent decision-makers with fiduciary duties to the company but state officials entrusted with making decisions for SOPAMIN that advance the policies and interests of the state.

Certain key ministries also play roles that would, in any other circumstance, be played by the board or management. The Ordinance provides that the Minister of Mines and the Minister of Finance are "in charge, each to the extent that it concerns him, *of the execution of th[e] ordinance.*" Beckett Decl., Ex. Q, Art. 6 (emphasis added). This makes these ministries directly responsible for achieving SOPAMIN's mission.

The Minister of Mines also has other roles in connection with SOPAMIN that would be played by management in a normal corporation. The Minister has the duty of ensuring the other ministries are apprised of SOPAMIN's activities. Beckett Decl., Ex. Q, Art. 5. The Ordinance provides that "[t]he decisions made by the company in accordance with the terms of any program contract give rise to information of the Minister of Mines who, in turn, notifies all the Ministers

16

concerned." *Id.* In addition, it appears that it is the Ministry of Mines – rather than the board itself – that convenes SOPAMIN board meetings. In one set of SOPAMIN board meeting minutes, the representative of the Ministry of Mines apologized on behalf of the ministry for failing to call a SOPAMIN board meeting. Beckett Decl., Ex. U at 3 ("Mr. Amadou Nouhou apologizes on behalf of the Minister of State, Minister of Mines and Industrial Development and the Managing Director for the delay in convening the Board of Directors meeting which should have been held earlier.").

The government ministries also have direct control over SOPAMIN's Director General. The Director General is directly appointed by decree of the Nigerien government's Council of Ministers, which is a ministerial cabinet. Beckett Decl., Ex. S at 2. The Director General answers directly to the Minister of Mines and the President of the Republic regarding SOPAMIN's business decisions. *See* Beckett Decl., Ex. Q, Art. 5. Thus, SOPAMIN management is also directly beholden to Niger.

This is all consistent with the fact that under Nigerien law, SOPAMIN, although veiled in the corporate form, is the subject of an organizational trusteeship closely supervised by the state. As the Nigerien government's web site reflects, SOPAMIN is an *"organisme sous tutelle,"* or "organization trust."[9] The concept of a *"tutelle administrative"* or administrative trust, is derived from French law, which is the basis of the post-colonial Nigerien legal system. This trusteeship status involves a close degree of day-to-day state supervision and control that ensures that the organization acts in a manner that is consistent with the state and public interest. *See generally* Beckett Decl., Ex. KK. As a result, SOPAMIN's corporate legal form does not mean it is

---

[9] *See* www.mines.gouv.ne/spip.php?rubrique28, (last visited October 20, 2016), drop-down menu under "Ministère," secondary drop-down menu showing "Organisme Sous Tutelle" and further drop-down menu listing organizations in this category including "SOPAMIN SA."

independent from the state. To the contrary, pursuant to the unique *organisme sous tutelle* institution, which has no direct analogue in U.S. law, SOPAMIN is a corporate ward of the state, and under direct state supervision and control. On this basis alone SOPAMIN is an alter ego and/or agent of Niger as a matter of definition.

This close state control of SOPAMIN's operations is evident in SOPAMIN's recent acquisition of an equity stake in SML, a company with a gold mining license. In SOPAMIN's board minutes, the Director General stated "that at each stage" of the SML acquisition he "informed the Minister of Mines and Industrial Development and the President of the Republic." Beckett Decl., Ex. U at 4. Tellingly, the Director General (Managing Director) of SOPAMIN characterized this investment as one in which "the State of Niger [became] the sole shareholder" of the mine, notwithstanding that it is SOPAMIN that is the legal owner of the company, and not Niger directly. *Id.*

Another fact indicative of the level of control that Niger exercises over SOPAMIN is the ability of Nigerien officials to control and disperse SOPAMIN funds directly and without the involvement of SOPAMIN's board or management. For example, on December 11, 2012, upon information and belief, Mr. Massoudou Hassoumi, the Minister of the Interior and Public Security, and the Director of the Cabinet of the President of Niger, personally signed a wire transfer order directing BNP Paribas to wire $319 million from a SOPAMIN bank account to a Lebanese company. Africard has obtained a copy of the wire transfer order, which is, on information and belief, signed by Mr. Hassoumi. The signature on that document can be compared to the signature of the same minister on official correspondence. *See* Beckett Decl., Ex. Y; *see also* Beckett Decl., Ex. EE (an official government letter from Minister Hassoumi

bearing the same signature as the BNP Paribas withdrawal order transferring $319 million from SOPAMIN's bank account).

Minister Hassoumi had no position in SOPAMIN at that time of the wire transfer (or, on information and belief, at any time). The fact that a state official is apparently an authorized signatory for a SOPAMIN account, and can wire such a large sum on money at his own discretion, demonstrates that the state regards SOPAMIN as merely an extension of the state itself and views SOPAMIN's assets as being at the disposal of the state: *See U.S. Fid. & Guar. Co.*, 1999 WL 307666, at \*8-\*10 (finding *Bancec* presumption in part rebutted when bank accounts of instrumentality are controlled indirectly by a foreign sovereign).

As with Iran in *Mckesson,* Niger extensively controls SOPAMIN through (i) control of a majority of SOPAMIN's stock; (ii) the appointment of a majority of the board of directors; (iii) guiding SOPAMIN's decisions, through the government appointed representatives that act as SOPAMIN directors, in order to ensure that SOPAMIN effectuates the interests of Niger, since it manages the "holdings of the Republic of Niger;" (iv) appointing directly the Director General; (v) seeking government approval for business decisions; and (vi) having the power to withdraw SOPAMIN funds at its will. *See generally* Beckett Decl., Exs. Q, U. Niger's control is so pervasive that even the Director General (Managing Director) refers to SOPAMIN's assets as those of Niger. Accordingly, the evidence above clearly shows that SOPAMIN is an alter-ego of state.

### 3. Niger Uses SOPAMIN's Property as Its Own, Ignores The Separate Legal Status Of Niger, And Directly Involves Itself In SOPAMIN Decisions

Niger also repeatedly ignored SOPAMIN's management and corporate form by agreeing to critical commercial terms with SOPAMIN counterparties without the involvement of

SOPAMIN, by acting for or as SOPAMIN in commercial transactions, and by treating SOPAMIN's funds as its own.

Niger's principal method of earning revenue from its uranium reserves is by entering into joint ventures with private companies to mine uranium ore. Niger owns a minority interest in these joint ventures through SOPAMIN who is a partner in these joint venture groups with Areva, a large French nuclear company. *See* Beckett Decl., Exs. Z, AA. Among the joint ventures in which Areva and SOPAMIN are parties are SOMAIR and COMINAK.[10] *Id.*

As a partner, SOPAMIN is entitled to purchase uranium concentrates produced by the joint venture at attractive prices. It then resells the uranium (after processing) to commercial customers to earn revenue. Beckett Decl., Ex. L, at ¶¶ 3, 11 & 13. Among SOPAMIN's customers is Exelon Generation Company LLC, which operates multiple nuclear power plants in the United States. Beckett Decl., Ex. K. It is evident that the price SOPAMIN pays for the concentrates is a critical commercial term because it is a key factor in determining the amount of revenues SOPAMIN will earn from its sales to down-stream buyers. SOPAMIN's margin is the difference between the price at which SOPAMIN purchases the uranium ore from the joint ventures and the price at which SOPAMIN sells it to its customers.

It is therefore telling that SOPAMIN had no role in determining the price at which the joint venture sells the uranium and the price at which SOPAMIN buys this uranium. *See generally* Beckett Decl., Ex. W. That price was set by Niger and Areva directly, without the participation of SOPAMIN, in a completely separate agreement to which SOPAMIN was not a party. *Id.*; *see also* Beckett Decl., Ex. FF, at 5 ("negotiations with AREVA as well as other

---

[10] Areva owns 63.6% of SOMAIR and SOPAMIN owns 36.4%. Beckett Ex. Z. As for COMINAK, Areva owns 34% and SOPAMIN owns 31%, collectively a majority of the stock, with another 35% held by two other companies. Beckett Ex. AA.

mining companies have not been managed by technocrats from the Ministry of Mines and Enegery, but instead have been negotiated by politicians at the highest level."). On May 26, 2014, Niger and Areva entered a "Strategic Partnership Agreement" which was signed on behalf of Niger by the Minister of Mines and the Minister of Finance, but not by SOPAMIN. Beckett Decl., Ex. W. The SPA establishes the uranium concentrate price by providing that "all shareholders of SOMAIR and COMINAK" – which includes SOPAMIN – shall purchase uranium ore at a price determined by a formula. *Id.* at 7.

The fact that Niger agreed to this critical commercial term with SOPAMIN's joint venture partner directly demonstrates that SOPAMIN has no real independent identity. *See U.S. Fid. & Guar. Co.*, 1999 WL 307666, at *8-*10 (finding *Bancec* presumption in part rebutted when contractual relations of instrumentality are controlled indirectly by a foreign sovereign). Whether Niger usurped SOPAMIN's role as a joint venture partner or exercised SOPAMIN's rights directly without its involvement, it completely ignored SOPAMIN's purportedly separate legal personality. In addition, Niger has also directly inserted itself in the contractual performance of SOPAMIN's contract with Exelon. On at least one occasion, Exelon received an invoice from SOPAMIN on Niger's Ministry of Mine letterhead. Beckett Decl., Ex. O.

This demonstrates that SOPAMIN and the state are a single decision maker. This is also clear from the fact that the contract between SOPAMIN and Exelon describes both SOPAMIN and the Ministry of Mines as "agencies" of the Government of Niger. Beckett Decl., Ex. K at 3. SOPAMIN's status as an agency is further underlined by the force majeure provisions in the Exelon contract that provide expressly that SOPAMIN cannot invoke its own acts as a Nigerien "agency" to excuse its contractual non-performance. *Id.* at 9. Moreover, this description of SOPAMIN as a Nigerien "agency" is apt in light of the fact that SOPAMIN has stated itself

stated that "on behalf of the state of Niger, monitors mining companies and therefore we are led to perform regular audits and inspections concerning environmental protection, among other things." Beckett Decl., Ex. L. Finally, and as described above, government ministers have signature authority over SOPAMIN accounts and have moved vast amounts of money out of those accounts with the stroke of a pen. For all these reasons, SOPAMIN lacks any independence from the state of Niger and is nothing more than its alter ego and/or agent.

4. **Niger Exerts Economic Control Over SOPAMIN and SOPAMIN's Profits Go To Niger, Who Is The True Beneficiary Of SOPAMIN's Actions**

Niger also controls SOPAMIN's finances. Indeed, Niger's control over SOPAMIN is so extensive that in 2010, in anticipation of a budget shortfall, Niger caused SOPAMIN to advance dividend payments to Niger before they were due. Beckett Decl., Ex. CC. In total, SOPAMIN advanced Niger two billion CFA a year earlier than it was otherwise required to do so. *Id.* In addition, Niger has the ability to move SOPAMIN's funds directly, as shown above. Niger also directly funds SOPAMIN's operations through "a separate budget allocation" giving it direct control over SOPAMIN's finances. Beckett Decl., Ex. N at 8.

As courts have determined, when a foreign sovereign exercises pervasive financial control over an instrumentality this may warrant a finding that the instrumentality is not independent from the state. *See Kensington Int'l Ltd. v. Republic of Congo*, No. 03 Civ. 4578 LAP, 2007 WL 1032269, at *3 (S.D.N.Y. Mar. 30, 2007) (finding that the *Bancec* presumption is overcome when the state financially controls the instrumentality's finances and funds). Here, Niger's financial control of SOPAMIN is so far reaching that it can accelerate its dividend and tax payments, control its funds, and arrange its finances directly. This is the antithesis of a separate autonomous corporation. It follows that the only reasonable conclusion is that SOPAMIN is not an independent entity.

22

**B. Africard Will Suffer Irreparable Harm if the Nigerien Assets are Not Restrained**

Preliminary relief, of the nature requested by Africard, is appropriate when a failure to issue such a relief could undermine a court's ability to grant effective relief on the merits. *In re Feit & Drexler, Inc.,* 760 F.2d 406, 416 (2d Cir. 1985); *Smith v. Fed. Reserve Bank of N.Y.,* 280 F. Supp. 2d 314, 316 (S.D.N.Y. 2003), *aff'd,* 75 F. App'x 860 (2d Cir. 2003), and *aff'd sub nom. Smith ex rel. Estate of Smith v. Fed. Reserve Bank of N.Y.,* 346 F.3d 264 (2d Cir. 2003) (finding plaintiffs faced a likelihood of irreparable harm where sole asset available to satisfy judgment was risk of being disbursed). As the Second Circuit has stated, monetary damages are an ineffective remedy against recalcitrant foreign sovereigns, as they will simply refuse to pay any judgment. *See NML Capital Ltd. v. Republic of Argentina,* 699 F.3d 246, 262 (2d Cir. 2012).

Niger has frustrated creditors in the past by failing to appear in U.S. court actions and ignoring court orders. In *Export-Import Bank of China v. Niger,* the Court noted that Niger "failed to satisfy, or even attempt to satisfy in any part, the order of judgment entered 16 years ago. What began as roughly $75 million order of judgment in 1998 has now accrued with interest to over $180 million." The court sanctioned $2,500 per day for failing to appear. Memorandum & Order Imposing Sanctions, *Export-Import Bank of China v. Republic of Niger,* No. 1:97-cv-03090-LAK-SN, at 8 (S.D.N.Y. Mar. 19, 2015).

Additionally, as discussed earlier, and evidenced by the BNP Paribas withdrawal order form, although the bank accounts in question are SOPAMIN bank accounts, Nigerien government officials, who have no formal role in SOPAMIN, have the power to withdraw hundreds of millions of dollars from SOPAMIN bank accounts at their discretion. *See* Beckett Decl., Ex. Y.

Indeed, if the funds are not restrained, Niger and/or SOPAMIN can transfer the funds at issue at the stroke of a pen or the push of a button. If this occurred, Africard would suffer irreparable harm because Niger would likely become "judgment proof" in the United States. *See, e.g. Energy Capital Co. v. Caribbean Trading and Fidelity Corp.*, No. 93 Civ. 8100 (JFK), 1994 U.S. Dist. Lexis 15494 at *6 (S.D.N.Y. Oct. 28, 1994) (preliminary relief granted where risk existed that judgment debtor "will become judgment proof"); *Fireman's Ins. Co. v. Keating* 753 F. Supp. 1146, 1153 (S.D.N.Y 1990) (injunctive relief proper where non-movant could remove assets). Accordingly, without a restraining order, Niger will be able to empty the Citibank accounts potentially leaving Africard without any practical remedy in the United States and inexorably frustrating the D.C. Judgment and the present action.

## C. The Balance of Equities Favors Issuing the Restraining Order

The balance of equities favors grating Africard's request for a TRO. The purpose of a TRO is to preserve the status quo between the parties prior to adjudication on the merits. *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) ("The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits"). As discussed above, if the Nigerien Assets are not restrained, the funds could be transferred at any moment, potentially leaving Africard with no remedy. Moreover, Niger has consented to waive its sovereign immunity if Africard seeks conservatory measures. D.E. 6, Ex. 1 at Art. 3. Thus, Niger cannot invoke equity against the temporary restraint of the funds and the balance of equities favors the issuance of a TRO. Granting the Restraining Order Promotes the Public Interest

Granting the TRO will promote the public interest. By restraining the assets, the Court will protect its role as the adjudicator of this dispute. The public interest would be ill-served were Niger to take advantage of the Court's deliberative process to move assets with the intent of

24

frustrating the very purpose of the Court's deliberations. This is especially the case when the judgment creditor is a foreign sovereign as they are difficult to compel, especially when the sovereign ignores the legal process and has a history of shirking its obligations in that process.

## D. Security

Because the infringement on any legitimate rights Niger/SOPAMIN may have is minimal, Africard respectfully submits that no security is required. However, Africard is prepared to post security as the Court sees fit pursuant to Federal Rule of Civil Procedure 65.

## IV. CONCLUSION

For the foregoing reasons, Africard respectfully requests that this Court grant an order (1) immediately restraining Citibank, Niger, SOPAMIN, and any affiliate of either of these entities, and any other person or entity with notice of the order from making or suffering any sale, assignment or transfer of, or interference with, the Nigerien Assets until Africard's motion for a restraining order is adjudicated by the Court, and (2) requiring Niger to show cause as to why an order should not be entered authorizing Africard to serve a restraining notice on Citibank, Niger, and SOPAMIN.

Dated: New York, New York
October 20, 2016

CHADBOURNE & PARKE LLP

By:_____
    Mark D. Beckett
    Christian Urrutia
1301 Avenue of the Americas
New York, NY 10019
(212) 408-5100 (telephone)
(212) 541-5369 (facsimile)
mbeckett@chadbourne.com
currutia@chadbourne.com

*Attorneys for Petitioner-Judgment Creditor*
*Africard Co. Ltd.*